UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

VIENGKHAM SAENSIRISOUK             Case No.

**Plaintiff**                                     Judge

VERSUS                                        Magistrate

PAMELA BONDI in her official capacity
as Attorney General of the United States;
KRISTI NOEM, in her official
capacity as the Secretary of the United
States Department of Homeland Security;
And SCOTT LADWIG, in his official capacity
as Field Office Director, New Orleans
District of USICE ERO.

**Defendants**

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, VIENGKHAM SAENSIRISOUK, petitions this Court for narrowly tailored declaratory and injunctive relief to prevent Defendants from executing Plaintiff's removal from the United States by a method that—given Plaintiff's severe cardiac impairment—poses a substantial, foreseeable, and imminent risk of death or grave bodily harm. Plaintiff does not challenge the lawfulness of the removal order itself, but the manner and conditions of execution. Plaintiff asks this Court to enjoin the life-threatening method of removal, require reasonable medical accommodations (or alternatives) as mandated by Section 504 of the Rehabilitation Act, and to stay removal during the pendency of these proceedings. In support of this Complaint, Plaintiff alleges the following:

## CUSTODY

1. Plaintiff is in the physical custody of Defendants and U.S. Immigration and Customs Enforcement ("ICE"). Plaintiff is detained at the Central Louisiana ICE Processing Center in Jena, LaSalle Parish, Louisiana. Plaintiff is under the direct control of Defendants and their agents.

## JURISDICTION

2. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, including the Rehabilitation Act, 29 U.S.C. § 794.

3. Jurisdiction is further proper under 29 U.S.C. § 794a(a)(2), which authorizes judicial review and enforcement of the Rehabilitation Act against executive agencies and officials of the United States, including the Department of Homeland Security and U.S. Immigration and Customs Enforcement.

4. To the extent Plaintiff seeks declaratory and injunctive relief, this Court also has jurisdiction under 28 U.S.C. §§ 2201 and 2202, empowering federal courts to declare the rights of parties in cases of actual controversy and to grant additional relief as necessary to effectuate such declarations.

5. This suit is not barred by 8 U.S.C. § 1252 because Plaintiff does not challenge the validity of any removal order, but only the manner of execution and the associated violations of federal statutory obligations. The requested relief does not seek to vacate, enjoin as unlawful, or otherwise alter the legal validity of the removal order; it seeks only to prohibit a method of removal that violates the Rehabilitation Act. *Franco-Gonzales v. Holder*, 767 F.Supp.2d 1034, 1044-46, 1048-51 (C.D. Cal. 2010).

6. Plaintiff has made efforts to pursue administrative relief. ICE refused to accept an I-246 stay of removal application, first on the ground that he lacked a valid Laotian passport, and then again after he provided evidence of a pending passport application.

7. Notwithstanding these efforts, exhaustion of administrative remedies is not required in this case because Plaintiff seeks emergency injunctive, and declaratory relief to prevent imminent, life-threatening harm arising from the manner in which Defendants intend to execute his removal. Excusing exhaustion in Plaintiff's case is particularly appropriate because ICE officials have informed him that his flight to Laos will be scheduled "soon" and he believes it may be scheduled as soon as December 3, 2025.

8. Federal courts have uniformly held that exhaustion is not required for non-employment, non-IDEA, and non-prisoner claims under the Rehabilitation Act. *New Horizons Rehab., Inc. v. State*, 400 F.Supp.3d 751 (S.D. Ind. 2019)(rejecting administrative exhaustion and granting injunctive relief); *Smith v. City of Philadelphia*, 345 F.Supp.2d 482 (E.D. Pa. 2004); *Hewitt v. U.S. Office of Personnel Management,* 390 F.Supp.2d 685 (N.D. Ill. 2005); *Miener v. State of Mo.*, 673 F.2d 969 (8th Cir. 1982). Prudential exhaustion of administrative remedies is likewise not required or appropriate in this case where the Plaintiff's interest in immediate judicial review in the face of his imminent and life-threatening removal from the United States outweighs the government's interests in administrative efficiency. *Franco-Gonzales v. Holder*, 767 F.Supp.2d 1034, 1046-47 (C.D. Cal. 2010).

**VENUE**

9. Pursuant to 28 U.S.C. § 1391(e) and W.D. La. Local Civ. R. 77.3 venue is proper in the Alexandria Division of the Western District of Louisiana because Plaintiff is detained within this District, a substantial part of the events or omissions giving rise to the claims occurred or will occur in this District, and Defendants are officers or agencies of the United States.

## PARTIES

10. Plaintiff is a native and citizen of Laos. He has had a final order of removal since February 28, 2003.

11. Defendant, Pamela Bondi, is the Attorney General of the United States and is responsible for the administration of the immigration courts and the implementation and enforcement of the INA. Ms. Bondi is sued in her official capacity.

12. Defendant, Kristi Noem, is the Secretary of the Department of Homeland Security. She is responsible for the administration of ICE and the implementation and enforcement of the INA. Ms. Noem is sued in her official capacity.

13. Defendant, Scott Ladwig, on information and belief, is the Field Office Director of the New Orleans Field Office of ICE's Office of Enforcement and Removal Operations. In this capacity, he is responsible for the execution of Plaintiff's removal. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

14. Plaintiff is a forty-seven-year-old former lawful permanent resident of the United States who has lived in this country for nearly thirty-five years, having arrived as a child refugee from Laos in approximately 1990. His parents resettled in the United States through the federal refugee program after fleeing persecution, and Plaintiff was

admitted as a lawful permanent resident upon joining them. He has spent virtually the entirety of his life in the United States, where all of his family, medical providers, and community ties are located.

15. Removal proceedings were initiated against Plaintiff in 1999 following a Maryland burglary conviction. An Immigration Judge ultimately ordered Plaintiff removed to Laos in 2003. At that time, however, the government of Laos refused to issue travel documents for U.S.-resident deportees, and ICE released Plaintiff from custody on an Order of Supervision. For the next two decades, Plaintiff remained in the community without further immigration enforcement action against him.

16. In May 2025, after years during which Laos had declined to accept repatriation of U.S.-resident deportees, ICE began removals to Laos. And Plaintiff was arrested by ICE officers in Maryland on July 25, 2025.

17. Prior to that arrest, Mr. Saensirisouk had already undergone significant cardiac intervention due to the progressive deterioration of his heart function. Several years earlier, after being diagnosed with severe idiopathic dilated cardiomyopathy and chronic systolic heart failure, his treating cardiologist determined that he was at heightened risk of malignant arrhythmias and sudden cardiac death. In response, an implantable cardioverter-defibrillator ("ICD") was surgically placed in his chest to manage life-threatening ventricular tachyarrhythmias.

18. Over time, however, the ICD began to erode through the surrounding tissue and skin, a known but serious complication indicating loss of tissue integrity and increasing risk of infection and device failure. Well before ICE took him back into custody in July 2025, his cardiology team had already determined that the device was

failing and required surgical replacement. He had been undergoing evaluation and planning for replacement surgery at the time ICE apprehended him.

19. At the time of his arrest by ICE, Mr. Saensirisouk informed the arresting agents of his heart condition and of the planned intervention to replace his ICD. Although the arresting agents made arrangements to pick up Plaintiff's heart medications from his home in Maryland, ICE took him on a multi-leg airplane and van/bus journey from Maryland to Texas, to Arizona, and finally to El Paso, Texas; a journey that lasted almost 24 hours.

20. During nearly all of those 24 hours, Mr. Saensirisouk was in shackles, with limited mobility, and was offered only sandwiches and water. Besides bathroom breaks, he was offered no significant opportunities for ambulation during the flights. Although there was a nurse onboard the ICE flights, and although he received some of his medications, during particular legs of the journey the medical professionals did not have access to his heart medications and were not able to provide them to him in a timely manner. Consistent with his cardiologists' concerns, Mr. Saensirisouk experienced familiar and frequent symptoms of cardiac distress during this almost 24-hour journey: feeling lightheaded, and experiencing shortness of breath.

21. Mr. Saensirisouk's medical history makes the execution of his removal to Laos extraordinarily dangerous. He suffers from severe dilated cardiomyopathy, chronic systolic congestive heart failure, dyspnea, syncope, hypertension, tricuspid valve regurgitation, and venous stasis. His ejection fraction is critically low. Multiple cardiologists, including Dr. Reed Shnider (his treating physician) and Dr. Kevin Doyle, have concluded that Mr. Saensirisouk is medically fragile and at significantly heightened

risk of fatal arrhythmia, deep vein thrombosis, and cardiac decompensation. The risk is substantially intensified by prolonged immobility, restraint, dehydration, and the lowered cabin pressure associated with long-haul flights.

22. In October 2025, while detained at the El Paso ICE Processing Center, Mr. Saensirisouk underwent emergency surgery to replace his ICD after his previous device had eroded through the chest wall prior to his arrest by ICE in July 2025.

23. Although ICE agents informed him that Laos has required a medical clearance as a condition for issuing his travel document, no cardiologist has examined Mr. Saensirisouk since this surgery. Upon information and belief, ICE nevertheless intends to remove Mr. Saensirisouk to Laos on a multi-leg charter flight that typically lasts forty to sixty hours, during which detainees are restrained for the entire duration and generally receive limited medical monitoring.

24. As detailed in Dr. Doyle's sworn declaration (Plaintiff's. Ex. 1), prolonged immobility, dehydration, and hypobaric conditions dramatically increase the risk of fatal arrhythmias and thromboembolic events in patients with Mr. Saensirisouk's condition. Government reports and independent investigations confirm that ICE Air Operations provide limited medical support on such flights and have previously experienced serious in-flight medical emergencies. Deporting Mr. Saensirisouk under these circumstances would expose him to a foreseeable and substantial risk of serious cardiac complications.

25. Publicly available reports and oversight analyses describing ICE Air Operations confirm the aggravating transport conditions identified by Dr. Doyle as medically dangerous for individuals with advanced cardiac disease. These sources consistently document that ICE removal flights often involve prolonged, multi-leg

international itineraries during which detainees remain fully restrained (typically in handcuffs, waist chains, and leg irons) for extended periods that may exceed forty to sixty hours. [1] Such immobilization, combined with limited access to hydration, restricted movement, and reduced cabin pressure creates physiological stresses that substantially increase the risks of venous stasis, arrhythmia, hypoxia, and decompensated heart failure. These documented conditions align directly with Dr. Doyle's clinical assessment that ICE Air transport poses a foreseeable and potentially fatal threat to Plaintiff.

26.  Dr. Kevin Doyle, M.D., F.A.C.C., a board-certified cardiologist with extensive clinical and academic experience in managing complex heart failure patients, reviewed Mr. Saensirisouk's medical history, diagnostic records, and current clinical status. In his sworn declaration (Plaintiff's Exhibit 1), Dr. Doyle confirms that Mr. Saensirisouk suffers from severe non-ischemic dilated cardiomyopathy, advanced systolic heart failure, recurrent arrhythmias, dyspnea, and venous insufficiency, with an ejection fraction estimated at 20–25 percent.

---

[1] See Univ. of Wash. Ctr. for Human Rights, *Hidden in Plain Sight: ICE Air and the Machinery of Mass Deportation* (2019), https://jsis.washington.edu/humanrights/2019/04/23/ice-air/; U.S. Immigration & Customs Enf't, *ICE Air Operations Handbook* (Edition 1.0) (2015), https://www.ice.gov/doclib/foia/policy/iceAirOpsHandbookEd1_09012015.pdf; U.S. Immigration & Customs Enf't, *ICE Air Operations Handbook* (Edition 2.0) (2024), https://www.ice.gov/doclib/foia/policy/iceAirOpsHandbookEd2_02202024.pdf; Human Rights First, *ICE Flight Monitor – August 2025 Report* (2025), https://humanrightsfirst.org/library/ice-flight-monitor-august-2025-report/; U.S. Dep't of Homeland Sec., Office of Inspector Gen., *ICE Air Transportation of Detainees Could Be More Effective* (OIG-15-57) (2015), https://www.oig.dhs.gov/sites/default/files/assets/Mgmt/2015/OIG_15-57_Apr15.pdf; McKenzie Funk, *Inside ICE Air: Flight Attendants on Deportation Planes Say Disaster Is "Only a Matter of Time"*, ProPublica (2025), https://www.propublica.org/article/inside-ice-air-deportation-flights.

27.     Dr. Doyle further explains that the physiological stresses of prolonged air travel create substantially heightened and well-documented risks for individuals with severe cardiomyopathy. These include hypobaric cabin pressure; reduced oxygenation; prolonged immobility; venous pooling in the lower extremities; and dehydration. Based on published medical literature and his clinical experience, Dr. Doyle concludes that these factors significantly increase the risk of deep vein thrombosis, pulmonary embolism, malignant arrhythmias, and acute heart failure. He notes that these risks are exponentially increased when a person is unable to ambulate or adjust their posture for extended periods; conditions that are inherent to ICE Air Operations, where detainees are restrained in handcuffs, waist chains, and leg irons for the entirety of multi-segment flights that may extend for 40–60 hours.

28.     Dr. Doyle concludes:

> While there are measures that could lower his risk (such as regular ambulation while traveling, use of properly fitting graduated compression stockings, maintaining adequate hydration and strict adherence to prescribed dedications), even if these are insured there remains an unacceptably high risk of serious harm from arduous airplane travel in this patient with severe heart disease. Even with the safeguards, air transportation of this planned duration, especially, but not exclusively, under conditions of immobility, poses an unacceptable risk to this patient's life. Therefore, it is my professional judgment that the proposed removal is medically contraindicated for Mr. Saensirisouk.

[Plaintiff's Exhibit 1, at p. 6]

## LEGAL FRAMEWORK FOR RELIEF SOUGHT

29.     Federal law prohibits the government from subjecting individuals with disabilities to discrimination or from denying them meaningful access to government programs, services, and activities. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability… shall, solely by reason of her or

his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). The Department of Homeland Security and U.S. Immigration and Customs Enforcement are "Executive agenc[ies]" within the meaning of the Act.

30. Federal courts consistently recognize that immigration detainees are protected by § 504. *See, e.g., Fraihat v. U.S. Immigration & Customs*, 16 F.4th 613 (9th Cir. 2021) (addressing merits of class-wide § 504 claim brought by medically vulnerable ICE detainees); and *Franco-Gonzales v. Holder*, 767 F.Supp.2d 1034 (C.D. Cal. 2010) (finding liability under §504 for failing to provide accommodations to mentally disabled immigration detainees).

31. The Rehabilitation Act prohibits both intentional discrimination and the denial of reasonable accommodations necessary to afford individuals with disabilities an equal opportunity to benefit from a government program. *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574–575 (5th Cir. 2002). An agency violates the Act when it knowingly subjects a qualified individual with a serious medical disability to conditions that foreseeably endanger life or prevent safe participation in the agency's actions. *M.R. v. Dreyfus*, 697 F.3d 706 (9th Cir. 2012) (holding that plaintiffs raised serious questions under the ADA and Rehabilitation Act where a state policy reduced disability-related services in a way that predictably exacerbated severe medical and mental impairments and created a serious risk of institutionalization).

32. The Rehabilitation Act requires that DHS and ICE conduct removal operations in a manner that does not discriminate against individuals with serious medical disabilities, does not deny access to necessary medical accommodations, and does not

expose detainees to an impermissible risk of serious injury or death. When, as here, the method of removal itself poses such a risk, federal courts have both the authority and the obligation to intervene.

## CLAIMS FOR RELIEF

## CLAIM ONE

### VIOLATION OF § 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794.

33. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 32 above.

34. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States… shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a).

35. DHS and ICE are "Executive agenc[ies]" under the statute, and federal courts, including courts within the Fifth Circuit, have recognized that immigration detainees are protected by § 504 and may seek equitable relief to prevent disability-based discrimination. *See e.g. Fraihat v. U.S. Immigration & Customs*, 16 F.4th 613 (9th Cir. 2021); *Franco-Gonzales v. Holder*, 767 F. Supp. 2d 1034, 1051–52 (C.D. Cal. 2010).

36. To establish a violation of § 504, a Plaintiff must show: (1) that he has a disability; (2) that he is "otherwise qualified" for the program or activity at issue; (3) that he was excluded from participation in, denied the benefits of, or subjected to discrimination by the program; and (4) that the adverse action occurred solely by reason of his disability. 29 U.S.C. § 794(a). Discrimination includes not only intentional unequal

treatment but also the failure to provide reasonable accommodations necessary to afford a person meaningful access to a federal program.

37. Plaintiff meets all four elements. He suffers from severe dilated cardiomyopathy, advanced systolic heart failure, recurrent arrhythmias, venous insufficiency, and related conditions that substantially limit major life activities including circulation, breathing, and cardiac functioning. He is "otherwise qualified" to participate in ICE's removal system so long as appropriate accommodations are provided. Defendants are denying him meaningful access by insisting on executing removal through a method, forty-to-sixty hours of air transport, total restraint, immobility, dehydration, and reduced cabin pressure, that uniquely endangers individuals with his disability. These life-threatening risks arise solely from his cardiac disability and Defendants' failure to modify the manner of removal accordingly.

38. Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794a(a)(2), authorizes injunctive and equitable relief. Because Defendants' planned manner of removal exposes Plaintiff to a substantial and medically documented risk of serious injury or death, an injunction is required to prevent unlawful and discriminatory execution of the removal order. *Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45 (D. D.C. 2020)(granting preliminary injunction to require the government defendants to provide ASL interpretation during COVID-19 briefings).

## CLAIM TWO

## INJUNCTIVE RELIEF

39. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 38 above.

40. Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794a(a)(2), authorizes injunctive and equitable relief.  A temporary restraining order or preliminary injunction is warranted where the Plaintiff demonstrates: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury outweighs any harm the injunction may cause the government; and (4) that injunctive relief will not disserve the public interest. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (citing *Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)).

41. Plaintiff meets all four requirements. For the reasons set forth above, he is likely to succeed on his Rehabilitation Act claim. He faces imminent and irreparable harm because prolonged air travel poses a known risk of serious injury or death. Courts have long recognized that threats to health and welfare constitute irreparable injury. *See Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, 337 (5th Cir. 1981). The balance of equities overwhelmingly favors Plaintiff, as preventing removal imposes minimal burden on the government while the harm to Plaintiff is the potential loss of life. The public interest is served by ensuring governmental compliance with federal disability law.

42. Plaintiff is therefore entitled to a temporary restraining order preventing his imminent removal and preserving the status quo pending adjudication, and a preliminary and permanent injunction prohibiting Defendants from removing him under medically dangerous conditions.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court assume jurisdiction

over this action pursuant to the Rehabilitation Act and the Court's inherent equitable authority.

Plaintiff further prays that the Court issue a Temporary Restraining Order restraining Defendants, their officers, agents, employees, contractors, and all persons acting in concert with them from removing Plaintiff from the United States, or taking any steps to effectuate his removal, pending further order of the Court.

Plaintiff also prays that the Court issue a Temporary Restraining Order prohibiting Defendants from removing Plaintiff, or transferring him for purposes of removal, until this matter is resolved on the merits, and requiring that Defendants maintain Plaintiff within the jurisdiction of this Court during the pendency of this litigation.

Upon a determination of the merits, Plaintiff prays that the Court issue a Preliminary and Permanent Injunction prohibiting Defendants from removing Plaintiff under any method of transportation or removal that is medically contraindicated in light of Plaintiff's cardiac condition. Plaintiff alternatively prays that the Court order Defendants to provide reasonable medical accommodations as required by the Rehabilitation Act, including refraining from any method of transportation or removal that is medically contraindicated in light of Plaintiff's cardiac condition.

Plaintiff prays that the Court declare, pursuant to 28 U.S.C. §§ 2201–02, that Defendants' intended manner of removal violates Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

Plaintiff further prays for an award of reasonable attorneys' fees and costs pursuant to the Rehabilitation Act, 29 U.S.C. § 794a(b), and pursuant to the Equal Access

to Justice Act, 28 U.S.C. § 2412, to the extent such fees are recoverable.

Plaintiff prays for such other and further relief as this Court deems just and proper to prevent irreparable harm and to ensure compliance with federal law.

Respectfully submitted this 1st day of December, 2025.

                           s/ Kenneth A. Mayeaux
                          KENNETH A. MAYEAUX (17674)
                          Mayeaux & Associates L.C.
                          6554 Florida Blvd
                          Baton Rouge, LA 70806
                          Phone: 225-754-4477

*Counsel for Plaintiff*

## VERIFICATION

Pursuant to Fed. R. Civ. P. 65(b)(1)(A) I am submitting this verification on behalf of the Plaintiff because I am the Plaintiff's attorney. I have discussed with the Plaintiff the events described in this Complaint. On the basis of those discussions, I hereby verify that the statements made in this Petition are true and correct to the best of my knowledge.

                           s/ Kenneth A. Mayeaux
                          KENNETH A. MAYEAUX (17674)
                          Mayeaux & Associates L.C.
                          6554 Florida Blvd
                          Baton Rouge, LA 70806
                          Phone: 225-754-4477